**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **DAVID GROOMS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 06 C 2211** |
| ) | |
| **BARRY S. MARAM, Director,** ) | **Judge Rebecca R. Pallmeyer** |
| **Illinois Department of Healthcare and** ) | |
| **Family Services,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Medicaid funding was once available only to pay for an individual to receive care in an institution. Today, states may "waive" the need for individuals to receive services in an institution and, instead, provide funding for home or community-based medical care for Medicaid-eligible individuals. Federal matching funds are available for home or community-based care, however, only if the services provided cost no more than it would cost to care for the individual in an institutional setting. Subject to this and other prerequisites for federal approval, each state may define the terms of its waiver programs. In this case, the parties debate whether an existing Illinois waiver entitles a severely disabled adult—who requires a hospital-level of care to survive–Medicaid benefits enabling him to receive this care at home.

Plaintiff David Grooms suffers from Type II Glycogen Storage Disease ("GSD Type II"), a genetic disorder which progressively affects skeletal muscle and muscles involved in respiration. He retains his cognitive ability but is quadriplegic and suffers from a variety of other, related ailments. Until he reached age twenty-one, the Illinois Department of Healthcare and Family Services ("HFS") paid for Grooms to receive care in his home through the Illinois Medicaid program. As described in more detail below, Grooms's home care was funded by the Medically Fragile Technology Dependent Children's ("MFTDC") waiver. The MFTDC program pays for a participant's home care so long as the cost of home care does not exceed the cost of care in a hospital or skilled

pediatric nursing facility. On his twenty-first birthday, however, Grooms "aged out" of that program and is now eligible for Medicaid-funded home care under the Persons with Disabilities Medicaid waiver ("PWD"). The State of Illinois has opted to provide home or community-based care for disabled adults only if the cost of such care does not exceed the cost of care in a nursing facility. Under Illinois law, Grooms is therefore now eligible only for home care at a nursing-facility level of care and can receive hospital-level of care only in an institution.

Several key facts are undisputed. First, Grooms is Medicaid-eligible. Second, Defendant has not challenged Plaintiff's evidence that a nursing facility level of care is inadequate to Grooms's needs, and that only a hospital level of care–including many hours per day of nursing care—is appropriate for him. Third, although neither side has acknowledged it explicitly, both parties appear to recognize that, were Grooms to receive care in an institution rather than at home, Medicaid would pay for the care he needs. Fourth, the PWD waiver provides for home or community-based care only up to a nursing facility level of care, which is less than a hospital-level of care. In this lawsuit against Defendant Barry S. Maram, the Director of HFS, Grooms contends that by choosing to cap the benefits it will provide for Grooms's home care at the cost of nursing home care, HFS has violated the "integration mandate" of the Americans with Disabilities Act, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794(a), *see* 28 C.F.R. §§ 35.130(d) and 41.51(d). The case was set for a bench trial in October 2007. After opening statements, however, it became clear that the only disputed issue is the applicability of the integration mandate in this case—a pure question of law—so the court ordered summary judgment briefing on the issue. Having now reviewed the briefs on HFS's motion for summary judgment, the court concludes HFS is not entitled to judgment in its favor, as explained below.

**BACKGROUND**

I.    **Illinois Medicaid**

HFS operates Illinois's Medicaid program under Title XIX of the Social Security Act, 42 U.S.C. § 1396.  Under the Title XIX health care assistance program, the federal government provides funding for Medicaid programs administered and partly funded by the states pursuant to state-established guidelines for low-income individuals and families.  Specifically, the Medicaid program provides federal funds to enable states to "furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care."  42 U.S.C. § 1396.  The state may elect to provide certain services in its Medicaid program, including private-duty nursing services, which may be available at the recipient's home, at a hospital, or at a skilled nursing facility.  *See Radaszewski ex rel Radaszewski v. Maram*, 383 F.3d 599, 601 (7th Cir. 2004).  For a proposed program to qualify for federal funds, the United States Secretary of Health and Human Services ("HHS") must approve it.  *Id.*; 42 U.S.C. § 1396a.  Once a state's plan is approved, the federal government agrees to pay (among other obligations) an amount equal to the statutorily-defined "Federal medical assistance percentage" of the state's quarterly medical assistance expenditures.  42 U.S.C. § 1396b(a)(1).

A state with an approved Medicaid plan may also apply to the Secretary of HHS for a "waiver," which allows the state to include as "medical assistance" payments for "home or community-based services" (as opposed to institutional services) that the Secretary has approved and that are provided pursuant to a written plan of care.  42 U.S.C. § 1396n(c)(1).  In order for the state to qualify for such a waiver, the home or community based services it provides must be available to "individuals with respect to whom there has been a determination that but for the provision of such services the individuals would require the level of care provided in a hospital or

a nursing facility . . . the cost of which could be reimbursed under the State plan." *Id.* In other words, an individual is eligible for services under the a waiver only if, absent home or community-based care, he or she would be entitled to Medicaid benefits enabling him or her to receive care in an institution. In addition, the state must provide the Secretary satisfactory assurances that, among other things, the waiver is cost-neutral: the average per capita expenditure estimated by the State for medical assistance may not exceed the average estimated per capita expenditure that would have been required absent the waiver. 42 U.S.C. § 1396n(c)(2)(D). The parties agree that the Secretary of HHS has approved for Illinois two waivers relevant to this action: the MFTDC waiver and the PWD waiver. (Am. Ans. ¶ 17.) Waivers providing home or community-based care for qualified adults constitute Illinois's Home Services Program ("HSP"). Often, provision of care at home is less expensive than institutional care. Thus, according to one court, the HSP has proven "very cost-effective." *Radaszewski ex rel. Radaszewski v. Maram*, No. 01 C 9551, 2008 WL 2097382, at *7 (N.D. Ill. Mar. 26, 2008). In 2005, HFS reported a savings of $13,676 per participant (with 19,827 participants): community care cost per participant cost $19,140 per year, while cost to care for each participant in an institution was $32,816 per year. *Id.*

Grooms has taken advantage of the waiver programs available to him both as a child and as an adult. First, until his twenty-first birthday, Grooms participated in the MFTDC waiver program. Pursuant to the MFTDC program, the State has adopted regulations requiring HFS to "administer a home and community-based service (HCBS) waiver program . . . for disabled persons under the age of 21 years who are medically fragile and technology dependent." 89 Ill. Adm. Code § 120.530(a); *see also* http://www.hfs.illinois.gov/hcbswaivers/tdmfc.html. By its terms, this waiver program applies to individuals who would otherwise require a level of care provided by a hospital or a facility certified by the State to provide long-term care for persons under twenty-two years of age. 89 Ill. Adm. Code § 120.530(b). Eligible ventilator-dependent individuals, such as Grooms,

are entitled to reimbursement for home care so long as the cost of such care does not exceed the cost of hospital-level care.  89 Ill. Adm. Code § 120.530(e)(3)(A).

Now that he is an adult, Grooms receives home care as a participant in the PWD waiver. That waiver, for which disabled individuals under the age of sixty may qualify, differs from the MFTDC waiver in several ways.[1]  The PWD waiver enables HFS to fund home or community-based care at a nursing facility-level of care for eligible adults with physical disabilities who would otherwise be forced to live in a nursing facility.  *See* 89 Ill. Adm. Code §§ 676.10(a), 676.30(j), 676.40, & 682.100**;** http://www.hfs.illinois.gov/hcbswaivers/disabilities.html.   In contrast to the MFTDC waiver, which is administered by the University of Illinois Division of Specialized Care for Children, Illinois's Department of Human Services bears direct operational responsibility for the PWD waiver.  89 Ill. Adm. Cod § 676.10(b).   The State's PWD waiver uses a Service Cost Maximum ("SCM") to limit the benefits available to participants; the individual's SCM directly corresponds to the cost the State would bear for providing nursing care for the individual in an institutional setting.  89 Ill. Adm. Code § 679.50; *Radaszewski*, 383 F.3d at 602.  In other words, the SCM functions as a cap: the cost of care for a disabled adult in a nursing facility is the maximum benefit that individual can expect to receive for his or her home care.  To calculate the SCM for individuals who are eligible for care in an institution but choose to receive home or community-based care, Illinois uses a Determination of Need ("DON") test, which measures what is referred to as an individual's "imminent risk of institutionalization."   89 Ill. Adm. Code §§ 679.10(b), 676.30(d).  Thus, the DON test assesses an individual's physical eligibility for the Home Services Program, including the extent of his or her impairment and need for external care.  89 Ill. Adm.

_____

[1]        Federal law also treats individuals under the age of twenty-one differently than adults: the early periodic screening, diagnosis, and treatment services ("EPSDT") program is mandatory and requires states to provide any service listed in 42 U.S.C. § 1396(a) that is "medically necessary" to the individual under twenty-one years old.   States must provide those services–including private-duty nursing–whether or not they are available to the rest of the population.

Code § 679.10.   The DON assessment determines an individual's eligibility for placement in a hospital or nursing facility and/or for home services.   *Id.*   An individual's DON score is then found to correspond to an SCM.   *See* 89 Ill. Admin. Code § 679.50(b) (setting forth SCMs for participants in HSP).

Grooms argues that the DON calculus is irrelevant to his claims, because–based on his dependence on a ventilator–he received an "exceptional care" rate in October 2005.   (Def.'s 56.1 ¶ 52.)   Indeed, Illinois regulations recognize that no SCM is sufficient to serve individuals who require what the state refers to as "exceptional medical care," so HFS sets an "exceptional care rate" for those individuals.   89 Ill. Adm. Code §§ 140.569(a), 679.50(f); *Radaszewski*, 383 F.3d at 603.   Ventilator-dependent individuals receive exceptional care rates.   The Illinois Medical Assistance Statute, which establishes a program for providing various types of medical assistance including Medicaid, defines exceptional medical care as "the level of medical care required by persons who are medically stable for discharge from a hospital but who require acute intensity hospital level care for physician, nurse and ancillary specialist services. . . ."   305 ILCS 5/5-1.1(i). Only skilled nursing facilities that meet certain state requirements—or exceptional care nursing facilities—may receive payments for providing exceptional care.   305 ILCS 5/5-5.8a(a).   The exceptional care rate approximates the cost of providing exceptional medical care to an individual in an institution, and is calculated by identifying the daily exceptional care rate for the nearest approved exceptional care nursing facility to the individual's home and extrapolating a monthly exceptional care rate.   89 Ill. Adm. Code § 679.50(f); *Radaszewski*, 383 F.3d at 603 n.2. Nevertheless, as described below, even the exceptional care rate to which Grooms is entitled does not provide him with sufficient funding for the care he needs to remain in his home.

## II.    Grooms's PWD Waiver Benefits

Defendant admits that Grooms is disabled.  (10/31/07 Trial Tr. 22:4-5, Ex. D to Pl.'s Resp.)

Grooms was diagnosed with GSD Type II when he was twelve years old.  (Compl. ¶ 1; 10/31/07

Trial Tr. 7:1-6.)  This is a muscle disease, which progressively affects both skeletal muscle and the

muscles involved in respiration.  (Compl. ¶ 1.)  Grooms's condition has also caused him to suffer

from a variety of medical ailments, including cardiomyopathy, scoliosis, asthma, and osteoporosis.

(10/31/07 Trial Tr. 7:1-6.)  He is wholly dependent on a ventilator for his breathing.  (*Id.*)  In addition,

Grooms is a quadriplegic who must rely on others for virtually all care and mobility.  (Compl. ¶¶ 1-2.)

Grooms has some use of his hands, and is able to drink from a straw, feed himself certain foods,

and use a computer.  (*Id.* ¶ 2.)  Aside from this, he retains virtually no body functions.  (*Id.*)  His

cognitive function, on the other hand, is unimpaired.  (*Id.*)

Nor are the particulars of the Medicaid benefits Grooms has received disputed in this action.

The parties agree that Grooms is eligible to receive Medicaid assistance (Def.'s 56.1 ¶ 1), and do

not dispute that Medicaid provides funding for necessary institutional care including, if necessary,

hospitalization.  Grooms received skilled nursing care at home pursuant to the MFTDC program

until  his  twenty-first  birthday.   (Compl.  ¶  26.)   Grooms  notes  that  during  2005,  HFS  paid

approximately  $16,000  for  monthly  medical  services  provided  by  a  Registered  Nurse  and  a

Licensed  Practical  Nurse  as  well  as  approximately  $1,000  per  month  for  respite  care,  which  is

temporary,  short-term  care  of  an  individual  with  a  disability  to  provide  families  with  a  break  from

caregiving.  (*Id.* ¶ 27.)  Defendant's proffered expert–Todd D. Menenberg–echoed this, expressing

his understanding that Grooms received through the MFTDC program nursing services costing

$16,000 per month and respite care costing $1,000 per month.  (*Grooms v. Maram* Expert Witness

Report dated 3/19/07 ("Menenberg Rept."), Ex. D to Pl.'s 56.1.)  Grooms also contends that his

reimbursed medical expenses in the year before his twenty-first birthday totaled approximately

$221,760.  (Compl. ¶ 27.)  Grooms's parents were responsible for the rest of his medical care, though the record does not reveal what this remaining medical care included.  (*Id.*)

On January 21, 2005, Grooms; his mother; his nurse; his case manager from the University of Illinois Division of Specialized Care for Children, which administers the MFTDC program; and Susan Whitney (a counselor from the Department of Human Services' Division of Rehabilitation Services, which administers PWD waivers) met to discuss the Home Services Program and the services that would be available for Grooms once he aged out of the MFTDC program.  (Def.'s 56.1 ¶ 47.)  Generally, when an individual is approved to receive services at home, a "Service Plan" is developed for his or her Medicaid assistance.  Whitney completed an Interim Service Plan which afforded Grooms total monthly service benefits of $150 for twenty hours per month of Personal Assistant ("PA") services.  (*Id.* ¶ 48.)  Then, on September 24, 2005, an Addendum Service Plan was developed for Grooms (presumably by Whitney in connection with Grooms's medical advisors); it provided 406.25 hours of LPN services for a total of $8,125 per month and fifty hours of PA services for a total of $392.50 per month.  (*Id.* ¶ 51; Home Services Program Service Plan for David W. Grooms dated 9/24/05, DX 56.)  This resulted in a total monthly payment of $8,517.50 for Grooms's home care.  (*Id.*)  On October 11, 2005–days after Grooms's twenty-first birthday–a "Second Addendum Home Services Program Service Plan" was developed for Grooms, providing 318 hours of Registered Nurse services for a total of $7,314 per month; 51.5 hours of Licensed Practical Nurse services for a total of $1,030 per month; and 36 hours of PA services for a total of $282.60 per month (Def.'s 56.1 ¶ 53; Home Services Program Service Plan for David W. Grooms dated 10/11/05, DX 57.)  In sum, Grooms was deemed entitled to Medicaid assistance totaling $8,626.60 per month for nursing and personal assistance services.  (*Id.*)  In that same month, HFS calculated an "exceptional care rate" for Grooms, because he is a ventilator-assisted individual; that rate was an amount not to exceed $8,633.20.  (Def.'s 56.1 ¶ 52; Home Services Program Exceptional Care Rate for Ventilator Assisted Individuals for David Grooms dated 10/05, DX 47.)

It is not apparent from the record whether this sum is in addition to or in place of the SCM calculated for Grooms. Then, on January 24, 2006, Whitney developed a Service Plan Reassessment for Grooms, which again afforded Grooms services identical to those provided by the October 2005 Service Plan. (Def.'s 56.1 ¶¶ 56-7.) It is undisputed that the benefits Grooms receives under the PWD waiver amount to less than half of what he received for home care under the MFTDC waiver program.

Despite this reduction in benefits, since his twenty-first birthday on October 8, 2005, Grooms has remained at his parents' home rather than in an institution. (Def.'s 56.1 ¶ 60.) His parents have personally cared for him around the clock, at considerable hardship. Due to their own worsening health and work demands, however, his parents are unable to continue making these extraordinary efforts. (Compl. ¶ 31.) Thus, Groom alleges, the reduction in funding for his care that results from the limitations in the state's PWD waiver will force him to enter an institution–a result he believes violates federal law. (*Id.* ¶ 36.) .

## III.    Litigation

Grooms initiated this litigation on April 20, 2006, alleging that HFS's actions violate the ADA and the Rehabilitation Act because his forced institutionalization will unlawfully segregate him from the community. (Compl.) Following a period of discovery, a bench trial was scheduled to begin on October 31, 2007. (Docket Entry No. 148.) The parties' opening statements revealed that there are no disputes of fact concerning Groom's physical condition or his medical needs:

> THE COURT: . . . .I thought I was going to be hearing evidence about Mr. Grooms' medical condition and why he could be perfectly well accommodated in a skilled nursing facility despite what the plaintiff characterizes as these grave needs for ventilator services and the like.
>
> But the openings establish to my satisfaction that it's the defendant's position that we really don't look at that issue. We really -- under the statutes and the regulations, we are not discriminating against him. We are making the care available that the statutes and regulations call for. And this additional level of care is simply not available to the plaintiff under the relevant regulations.

. . . .[M]y understanding is the defendant believes even if the plaintiff can demonstrate that his medical needs are such that they cannot be accommodated in a skilled nursing facility, he still is not entitled to more money for home-based care.

MR. HUSTON: That is correct. You have to cap it at a nursing facility level of care under the persons with disabilities [waiver].

(10/31/07 Trial Tr. 53:17-54:16.) Thus, the court declined to hear testimony and, instead, ordered additional summary judgment briefing on the disputed legal issue.

Defendant moved for summary judgment on November 30, 2007. (Docket Entry No. 149.) Defendant's position on summary judgment is not that hospital-level care is unnecessary for Grooms but, rather, that HFS has no obligation to fund hospital-level care for Grooms under the PWD waiver. Citing Supreme Court and Seventh Circuit cases holding that failure to integrate can constitute discrimination in violation of the ADA and Rehabilitation Act, Plaintiff counters that HFS is indeed obliged to provide adequate funding for Grooms's home care so long as home care is appropriate, acceptable to Grooms and his family, and cost-neutral. Plaintiff did not move for summary judgment but, on March 6, 2008, requested a preliminary injunction requiring the state to provide funding for Grooms to receive a hospital-level of care in his home. (Docket Entry No. 181.) As explained below, the court concludes that Defendant is not entitled to judgment as a matter of law at this stage and, because Plaintiff is likely to succeed on the merits of his claims, directs the parties to appear in court to assess what preliminary relief should be afforded to Grooms.

**DISCUSSION**

I.      **Summary Judgment Legal Standard**

Summary judgment is proper when the court, having reviewed the pleadings, depositions, transcripts, discovery responses, exhibits, and affidavits, finds that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In determining whether a

genuine issue of material fact exists, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). At this stage, Grooms must produce enough evidence to support a reasonable jury verdict in his favor, while Maram, as the moving party, bears the burden of proving that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *Hicks v. Midwest Transit, Inc.*, 500 F.3d 647, 651 (7th Cir. 2007).

## II.     Grooms's Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Due to the similarities between the relevant provisions of the statutes, the court's analysis will focus on Grooms's ADA claim but apply with equal force to the Rehabilitation Act claim. *Radaszewski*, 383 F.3d at 607. Certain basic elements of this ADA claim are undisputed here. First, Grooms is an individual with a disability (though the parties dispute whether he is "qualified" for the PWD waiver). (10/31/07 Trial Tr. 22:4-5.) In addition, HFS is a public entity within the meaning of Title II of the ADA and an entity that receives federal funds for purposes of the Rehabilitation Act. (Docket Entry No. 125-2 at Schedule (a)-5.) Thus, HFS is subject to the integration mandate implicit in each statute. Having agreed on these two elements of Plaintiff's claims, the parties dispute two key issues: (1) whether Grooms is qualified for the PWD waiver (and thus can be considered a qualified individual with a disability); and (2) whether Grooms was subject to discrimination by reason of his disability.

## A.    Grooms is a Qualified Individual with a Disability

Although Defendant now intimates that it has reserved the right to challenge Grooms's need for hospital-level care (Reply at 4 n.1), there is no factual dispute that Grooms in fact requires hospital-level care.  The only expert analysis referred to regarding Grooms's medical condition during the parties' opening statements was that of Dr. Mary Keen of the Marianjoy Rehabilitation Hospital and Clinics.  Plaintiff's counsel summarized that testimony as follows:

> Dr. Keen will testify she is familiar with the level of, particularly the staffing levels of nursing homes in Illinois, and that in her professional opinion, David would be unsafe were he to be placed in a nursing facility and provided the care provided to other patients.

> The evidence will also show that the State has made no effort to determine whether David could in fact be safely served in a nursing facility.  It did not submit any of its information to any facility for review or advice regarding whether such facility could or would safely care for him.  It has conducted no reviews of nursing facilities to determine whether they could provide needed care to a person with David's level of fragility and complexity.

(10/31/07 Trial Tr. 15:8-20.)  Defense counsel made clear that they would not present a defense medical expert.  (*Id.* at 39:12-13.)  Nor did Defendant suggest there had been any sudden significant improvement in Grooms's physical condition on his twenty-first birthday.  The court therefore noted specifically that defense counsel was not arguing that Grooms could be accommodated in a skilled nursing facility.  (*Id.* at 40:23-41:3.)  In other words, defense counsel has effectively conceded that Grooms needs a higher level of care than that provided in the HSP.

The evidence before the court confirms that Grooms cannot continue to live at home, absent additional assistance.  Grooms's Complaint asserts that his current level of assistance under the PWD waiver is insufficient to permit him survive at home, and that his parents will be forced to institutionalize him to ensure that he continues to receive the care he needs.  (Compl. ¶¶ 31, 36; *see also* 10/31/07 Trial Tr. 7:23-8:1.)  Since filing the Complaint, Grooms's situation has worsened. Plaintiff's counsel has advised the court that Plaintiff's parents, who have been providing care to substitute for the additional care Grooms once received and still needs, are no longer capable of

12

providing this assistance and that, even if they could, it would be inadequate to provide for Grooms's safety. (Docket Entry No. 182 at 10-13.) Dr. Keen confirmed that the levels of skilled nursing care Grooms currently receives are inadequate, putting him at risk of "serious medical crisis." (Keen Aff. dated 3/5/08 ¶ 10, Ex. C to Mot. for Prelim. Inj.) As of July 2007, Grooms's ventilator was disconnecting once or twice a night; he needed to be turned five times per night due to back pain (on bad nights, as many as fifteen to twenty times per night); he required suctioning approximately five times per day; and he could not be removed from his ventilator for more than a few seconds at a time. (*Id.* ¶¶ 6-7.) Thus, he needs someone to respond to alarms, adjust his oxygen levels, monitor his vital signs, and provide additional care. (*Id.* ¶ 8.) The risk of medical crisis without this constant care has already materialized: Grooms developed Methicillin-resistant Staphylococcus aureus ("MRSA"), a serious antibiotic-resistant staph infection. (*Id.* ¶ 9.) Dr. Keen believes that the inadequate nursing care Grooms receives may have precipitated this infection. (*Id.*)

In neither the summary judgment nor the preliminary injunction briefing does Defendant challenge the accuracy of this description of Grooms's medical condition or the inability of his parents to provide adequate medical care. The court therefore accepts as true that Grooms's medical condition continues to deteriorate, forcing him to be increasingly dependent on consistent skilled nursing care. The court also accepts as true that increased medical care and supervision would improve or stabilize Grooms's condition by, for example, preventing future staph infections. Absent this increased medical care and supervision, Grooms will be required to move to an institution.

The PWD waiver under which Grooms currently receives benefits is intended for individuals who would require a nursing-facility level of care. (Def.'s 56.1 ¶ 14.) Thus, Defendant contends that, if he requires hospital-level care, Grooms is no longer qualified for the PWD waiver. (Reply at 6.) The Seventh Circuit has considered this argument in a very similar case and rejected it. In

*Radaszewski*, the State argued that Eric Radaszewski was ineligible for the HSP because the cost of providing him continuous care would exceed the cost of exceptional care in a nursing facility, which is the maximum amount to be paid for at-home care. *Radaszewski*, 383 F.3d at 612. The court expressly disagreed, holding that Eric was a qualified individual with a disability because he was otherwise eligible for the PWD waiver: he had severe, long-term disabilities, he was Medicaid-eligible, and he was at risk of being placed in an medical institution. *Id.* In addition, home care was appropriate and beneficial for Eric. *Id.* There is no dispute that Grooms meets all these criteria. Finally, the *Radaszewski* court held that Eric was qualified for the HSP in that the cost of Eric's home care would not exceed the anticipated cost of caring for him in an institutional setting. *Id.* at 613. As discussed below, there is no evidence that for Grooms to receive home care would violate the cost-neutrality standard. Accordingly, Grooms is a qualified individual with a disability.

**B.      Grooms was Subject to Discrimination by Reason of his Disability**

**1.      Integration Mandate**

Even if he is qualified, Defendant contends, the governing statutes and regulations do not recognize Grooms's "integration" claim as stating a cause of action for discrimination in violation of the ADA. (Def.'s Mem. at 3-6.) This argument, too, contradicts the governing Supreme Court and Seventh Circuit precedent.

For purposes of this action, the ADA and Rehabilitation Act contain substantially similar requirements. The ADA's regulatory scheme makes clear that Title II establishes what is known as an "integration mandate." Specifically, "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). This integration mandate is not unlimited; the regulations also provide that while a public entity is required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability," there is an exception if "the public entity can demonstrate that making the modifications

14

would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).
The Rehabilitation Act contains similar requirements. That statute's regulations provide that programs shall be administered "in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d). In light of their similarity, courts "construe and apply" these provisions of the ADA and the Rehabilitation Act "in a consistent manner." *Radaszewski*, 383 F.3d at 607.

*Olmstead v. L. C. by Zimring*, 527 U.S. 581 (1999) explains what is meant by the integration mandate. "Unjustified isolation" of a disabled individual constitutes discrimination based on disability. *See id.* at 597. In applicable statutory findings, "Congress explicitly identified unjustified 'segregation' of persons with disabilities as a 'form of discrimination.'" *Id.* at 600 (quoting 42 U.S.C. §§ 12101(a)(2) & 12101(a)(5)). In *Olmstead*, the State of Georgia argued that it had not discriminated against disabled individuals by housing them in institutions and denying them community placement for two reasons: first, this denial of community-based treatment was not on account of their disabilities and, second, those individuals had not identified uneven treatment of similarly-situated individuals. *Id.* at 598. The Supreme Court rejected each argument, concluding that Congress "had a more comprehensive view of the concept of discrimination advanced in the ADA." *Id.* The Court explained that the integration mandate reflects two judgments: (1) institutionalizing persons capable of thriving in community settings "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life;" and (2) institutionalization interferes with individuals' everyday life activities, such as "family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 600-601. The court cautioned, however, that individuals not able to handle or benefit from community settings ought not be forcibly removed from institutional settings. *Id.* at 601-602. *Olmstead* thus established the following rule:

States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Id.* at 607.[2]

According to Defendant Maram, *Olmstead* does not establish a private right of action to enforce the integration mandate. The court finds no support for this interpretation in *Olmstead* itself, which expressly deems "unjustified institutional isolation" of disabled individuals to be actionable discrimination, under the delineated circumstances. *Olmstead*, 527 U.S. at 600. Defendant next seeks to distinguish *Olmstead* because that ruling did not require the State of Georgia to modify its Medicaid waiver but, rather, directed that the plaintiffs be placed into existing community-based institutions. Again, the court disagrees. In *Olmstead*, Georgia argued to the district court that requiring the state to immediately transfer the plaintiffs between institutions would fundamentally alter the state's Medicaid program, because Georgia was already using all its available funds to provide services to other persons with disabilities. *Id.* at 594. Thus, the *Olmstead* court would effectively require the state to modify its distribution of services if the district court determined that Georgia's current scheme violated the integration mandate. Regardless of whether Defendant's characterization is accurate, however, it is irrelevant unless requiring Illinois

---

[2]      Defendant challenges the regulations' validity. (Def.'s Mem. at 4.) Because the parties in *Olmstead* addressed only the proper construction and enforcement of the regulations, the court did not reach the issue of their validity. *Olmstead*, 527 U.S. at 592-93. This court also declines to address the matter, as the regulations are not the only source for the integration mandate *Olmstead* recognized. The *Olmstead* court also identified legislative history and findings suggesting that the ADA by its own terms was intended to offer the benefits of community living to individuals with disabilities. *Id.* at 599-600. In addition, it considered the position of the Department of Justice, as the agency that issued regulations implementing Title II of the ADA. *Olmstead*, 527 U.S. at 597-98. The Department of Justice "consistently advocated" that undue institutionalization constitutes discrimination by reason of disability. *Id.* at 597. Finally, neither party has engaged in any comprehensive analysis of the regulations' validity, rendering it inappropriate for consideration at this stage.

to modify its Medicaid waiver is an unreasonable accommodation, which the court will consider below.

Defendant's position is also inconsistent with Seventh Circuit authority. In a case substantially similar to *Olmstead* (though it involved an individual who, like Grooms, had a physical rather than a mental disability), the Seventh Circuit entertained an individual's claim for enforcement of the integration mandate. *See Radaszewski*, 383 F.3d 599. Eric Radaszewski was a "medically fragile" adult requiring around-the-clock, one-on-one care by a registered nurse in order to survive. *Id.* at 600-01. As of September 1, 2001, Illinois ceased to provide "private-duty nursing," or nursing services for an adult who requires care that is more individualized and continuous than that provided by a visiting nurse, a hospital nursing staff, or a skilled nursing facility's staff. *Id.* at 601. Thus, like Plaintiff Grooms, when Eric turned twenty-one and aged out of the MFTDC program, he lost entitlement to around-the-clock private-duty nursing. *Id.* at 602-03. The Illinois Department of Public Aid ("IDPA")–now HFS–determined that Eric was entitled to exceptional care, but contended that it was not authorized to pay for at-home medical care beyond what it would cost to provide Eric with exceptional care in a skilled nursing facility. *Id.* at 603. According to the IDPA, if Eric required treatment not covered by his existing Medicaid HSP, he would need to move to an institutional setting to receive the additional treatment within the Medicaid program. *Id.* The IDPA also determined that Eric could be adequately cared for in a nursing home facility. *Id.* Eric's mother filed a complaint on Eric's behalf, challenging the reduction in the level of Eric's private-duty nursing services. *Id.* The district court entered judgment on the pleadings for the State, holding, first, that plaintiffs had named the wrong defendant for its ADA claim by naming an individual rather than the public entity. *Radaszewski ex rel. Radaszewski v. Garner*, No. 01 C 9551, 2002 WL 31045384, at *2 (N.D. Ill. Sept. 11, 2002). With regard to plaintiff's Rehabilitation Act claim, the district court found that the lack of in-home nursing care available for Eric applied equally to handicapped and non-handicapped individuals and was thus lawful. *Id.* at *3.

The Seventh Circuit reversed. *Radaszewski*, 383 F.3d at 615. In remanding the case to the district court, the Court of Appeals applied the *Olmstead* test, holding that the integration mandate requires the State of Illinois "to provide community-based treatment for individuals with disabilities, so long as the State's treatment professionals find that such treatment is appropriate, the affected individuals do not oppose community-based treatment, and placement in the community can be reasonably accommodated, taking into account the State's resources and the needs of others with similar disabilities." *Id.* at 608. In *Radaszewski*, it was clear that Eric could be cared for at home and that neither he nor his family opposed the prospect of him receiving care at home. *Id.* The same is true here: the parties apparently agree that Grooms can receive treatment at home and, in fact, did so until his twenty-first birthday with Medicaid assistance; similarly, his parents' continued care for Grooms after he aged out of the MFTDC program makes clear that no affected individuals oppose such a treatment plan for Grooms. Thus, the only disputed issue here, as in *Radaszewski*, is whether the State can reasonably accommodate home treatment, taking into account the State's resources and the needs of others with similar disabilities. When addressing the reasonable accommodation prong, the *Radaszewski* court focused on the cost to Illinois of funding home care for Eric.

There, the State argued that compelling an increase to the exceptional care rate for individuals as severely disabled as Eric Radaszewski was not reasonable. *Radaszewski*, 383 F.3d at 609. The Seventh Circuit did not answer this question, as the factual record remained undeveloped. Instead, the court provided a roadmap for assessing the reasonableness of requiring the State to accommodate a request for home treatment. First, the court sought to identify the proper benchmark for assessing the financial cost of providing Eric home care. Ultimately, reasonableness would depend on two issues: whether a nursing home facility could meet Eric's needs and what level of care Eric would require in an institutional facility. *Id.* at 610. If a disabled individual cannot receive adequate care in a nursing facility, the "type and cost" of medical care

provided in a nursing facility is not a proper reference point for assessing whether services the individual seeks to receive at home would be provided in an institutional setting. *Id.* The inquiry regarding what level of care a disabled individual would require in an institutional facility is likewise critical because, if Eric would require "constant monitoring and continuous skilled assistance" in an institutional setting, the State would be required to provide Eric with those services in an institution. *Id.* at 611. If the services Eric would require in an institution were equivalent to around-the-clock, private-duty nursing care, then Eric might have a claim to receive private-duty nursing care at home, despite the fact that Illinois Medicaid does not ordinarily provide such a service. *Id.*

The *Radaszewski* court made clear, however, that the State would not be required to provide Eric with equivalent home care if doing so would place an unreasonable burden on the State or would force the state to fundamentally alter the nature of its programs. *Radaszewski*, 383 F.3d at 611. The State of Illinois has limited resources to allocate to disabled individuals, and, within certain parameters, the State is entitled to make these allocations. Although the *Radaszewski* complaint alleged that the cost of Eric's continued care at home did not exceed the continued cost of caring for him in an institution, *id.* at 613, this did not end the court's inquiry. Courts must also consider the overall costs borne by the state. For example, that Eric is cared for at home does not enable the state to close or reduce the size of a costly institution in which he might otherwise receive care. *Id.* at 614. The Seventh Circuit directed the district court, on remand, to evaluate the cost of Eric's care in the context of the overall costs of the Illinois Medicaid program, including the cost of maintaining existing institutions that provide care. *Id.* at 614-15.

As the court understands the teaching of *Olmstead* and *Radaszewski*, Grooms has a private right of action to contest a violation of the "integration mandate." Several district courts have reached the same conclusion. *Radaszewski*, 2008 WL 2097382, at *14 (on remand, entering judgment for plaintiff on ADA and Rehabilitation Act claims: "Defendant argues that neither the ADA nor [Rehabilitation Act] provide[s] for an independent claim for integration in the community and that

the authorities cited by Plaintiff do not recognize an independent claim for integration. Defendant's arguments are meritless and directly contrary to *Olmstead* and *Radaszewski*."); *Fisher v. Maram*, No. 06 C 4405, 2006 WL 2505833, at *4 (N.D. Ill. Aug. 28, 2006) (granting temporary restraining order: "As this court reads the *Radaszewski* opinion, it appears that the Court concluded that if the level of care which would have to be given in an institution in order for Eric to survive amounts to the equivalent of around-the-clock, private-duty nursing care, then Eric may well have a viable claim to receive private-duty nursing care at home because then, private-duty nursing care would present a reasonable alternative that would not require a fundamental alteration of the State's programs and services");[3] Opinion and Order, *Sidell v. Maram*, No. 05-1001 (C.D. Ill. May 14, 2007) (denying defendant's motion for summary judgment on integration mandate claims because PWD waiver providing home or community-based care in place of nursing-home level care is not co-extensive with providing waiver in place of all "institutional" care).[4] The court therefore concludes that Grooms may bring a claim for violation of the integration mandate if he satisfies the three factors set forth in *Olmstead* and *Radaszewski*.

---

[3] Most recently, Judge Guzman denied cross-motions for summary judgment in *Fisher v. Maram*, finding that there remained contested issues of fact appropriate for resolution at trial. Minute Order, *Fisher v. Maram*, 06 C 4405 (N.D. Ill. Mar. 20, 2008). In that Order, Judge Guzman reaffirmed that the integration mandate supports a cause of action under the ADA and Rehabilitation Act: "[D]efendant argues that there is no independent private right of action regarding the ADA and Rehabilitation Act's integration regulations. This argument misses the point. Plaintiff's ADA and Rehabilitation Act claims are based on defendant's alleged discrimination based on her disability." *Id.* at 3-4. In *Fisher*, there was a triable issue of fact as to whether a nursing home could provide appropriate medical treatment for the disabled individual. *Id.* at 4. Judge Guzman also found a triable issue of fact as to Defendant's affirmative defenses that providing the disabled individual with the requested relief would impose undue hardship on the State of Illinois, in light of conflicting expert opinion. *Id.* Judge Guzman has scheduled a jury trial for February 2, 2009. Docket Entry, *Fisher v. Maram*, No. 06 C 4405 (N.D. Ill. May 19, 2008).

[4] Judge McDade conducted a bench trial between May 5 and May 7, 2008; no final judgment has been entered in that case. Minute Entries, *Sidell v. Maram*, No. 05-1001 (C.D. Ill. May 5-7, 2007)

### 2.    The Discrimination Against Grooms

Defendant also urges that, even if there is a private cause of action for violation of the integration mandate, Grooms's situation does not establish the basis for valid claim under that theory because he does receive home care through the Illinois Medicaid program. (Def.'s Mem. at 6-7.) Specifically, Defendant contends that Grooms is eligible for and in fact enrolled in the HSP, and therefore has not been discriminated against because of his disability. As Defendant points out, Grooms's physician deemed him qualified to participate in the HSP, Grooms and/or his parents signed documents acknowledging having a choice between home care or nursing home care, and Grooms has in fact received home care for years. (Def.'s Reply at 2.) In other words, Defendant argues that there has been no violation of the integration mandate because Grooms is receiving home care. But because Grooms has provided unrebutted medical evidence that the home care he receives is insufficient, endangers his health, and, if not supplemented, will force him to seek treatment in an institution, Defendant's analysis is not persuasive. *Cf. Radaszewski*, 2008 WL 2097382, at *14-15 (entering judgment for Plaintiff on ADA and Rehabilitation Act claims where plaintiff was "at risk of being placed in an institutional setting" but cared for at home).

### 3.    Reasonable Accommodation

Because Grooms is a qualified individual with a disability and home care is appropriate for him, the court must decide whether the State can reasonably accommodate Grooms's request for home care. This requires the court to ask (1) whether a nursing home facility can meet Grooms's needs and (2) what level of care Grooms would require in an institutional facility. *Radaszewski*, 383 F.3d at 610. Based on this information, the court can determine what it would cost to care for Grooms in the appropriate institution and whether providing him home care would impose a reasonable expense on the state. As discussed earlier, there is no genuine dispute that a nursing home facility cannot adequately meet Grooms's needs, as the medical evidence presented by Grooms's counsel is unrebutted. In other words, the only question before the court is one of cost-

neutrality. The State has conducted no individualized analysis of the costs associated with caring for Grooms at home as opposed to in a hospital. Thus, there is no evidence that his receipt of one-on-one care at home would be more costly than care in a hospital setting. *See* Opinion and Order, *Sidell v. Maram*, No. 05-1001, at 23-24 ("Defendant has not put forward any evidence that receiving one-on-one care in a community setting is materially different (or more costly) than hospital based care. . . . Accordingly, Plaintiff's requested level of care does not bar her claim."). To the contrary, as evidenced by his participation in the MFTDC program, until Grooms turned twenty-one, the State recently determined that it was cost-neutral for him to receive home care, including sixteen hours per day of nursing care. There is no evidence that this cost-neutrality analysis has changed. Because the parties agree that Grooms is Medicaid-eligible, there is no dispute that Medicaid would pay for him to receive care in a hospital. Accordingly, there is no evidence that the State would bear additional costs were it to provide Grooms with the equivalent of hospital-level care at home. Based on the evidence that home care has been cost-effective for Grooms in past years, and the absence of any basis for finding a change in Grooms's circumstances, the court finds that HFS could reasonably accommodate Grooms's request for home care.

Instead, Defendant focuses on the nature of the change Grooms requests and the cost of that change within the system more broadly. Beginning with the first analysis, Defendant argues that requiring Illinois to expand the PWD waiver–by providing additional services, requiring selection of a new standard level of care, or raising cost caps–would fundamentally alter the nature of the services and programs that Illinois is legally obligated to provide and does provide to persons with disabling medical conditions. As explained above, the Federal Regulations dictate that a public entity need only "make reasonable modifications" to comply with the integration mandate and need not even make otherwise reasonable modifications if "the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

### i.    Fundamental Alteration

HFS suggests that, if the PWD waiver were extended such that a hospital level of care, as opposed to a nursing-facility level of care, is used as a benchmark for determining whether Medicaid assistance is cost-neutral, such an extension would fundamentally alter that program. HFS notes that the application it submitted to the Secretary of HHS when seeking approval of the PWD waiver–first approved in 1999 and then renewed in 2004–seeks reimbursement only for providing home and community-based services to individuals who would otherwise require care in a nursing facility.  (PWD Waiver Renewal dated 9/10/04, DX 9.)   The waiver format requires the applying state to specify whether it seeks a waiver "in order to provide home and community-based services to individuals who, but for the provision of such services, would require" care in–among other alternatives–a nursing facility or a hospital.  (Pl.'s 56.1 ¶ 1; PWD Waiver Renewal at 3025.) It was the State of Illinois's choice to seek a waiver only for individuals who would require nursing-facility level care; the option to provide a waiver for individuals who would require hospital-level care demonstrates that the federal government would approve a waiver for individuals requiring a hospital level of care.  Indeed, there is no indication that a need for care that exceeds what is available in a nursing facility disqualifies an individual for the PWD waiver.  *See* Opinion and Order, *Sidell v. Maram*, No. 05-1001, at 19-20.  The parties agree that the State had discretion when designing the PWD waiver and is, even now, permitted to alter the waiver's terms by submitting an amendment to the federal government for approval.  (Def.'s Am. Resp. to Pl.'s 56.1 ¶ 3.)  Through the amendment process, the State may add services to the waiver, delete services from the waiver, and/or change the selection of comparable institution for determining cost-neutrality.  (*Id.* ¶ 5.)  This would not be the first time Illinois amended its waiver; the State has submitted several waivers to the federal government in recent years.  (*Id.* ¶ 4.)[5]

---

[5]      There is no evidence in the record regarding whether these amendments resulted
(continued...)

As Judge Darrah explained in his decision on remand in the *Radaszewski* case, requiring the State to submit an amendment need not fundamentally alter the HSP or Medicaid waiver program. *Radaszewski*, 2008 WL 2097382. In his Federal Rule of Civil Procedure 52 findings, Judge Darrah observed: "Illinois could act in cooperation with the federal government to achieve community-based integration which may otherwise be impeded by existing rules or requirements. Thus, there is no need to adapt existing institutional-based services to a community-based setting that would impose unreasonable burdens or fundamentally alter the nature of Illinois' services and programs." *Id.* at *15. He noted, further, that the federal government has not denied a single waiver application in the last ten years. *Id.* at *10. Defendant here presents no basis to believe the federal government would deny the State's application for an amendment in this case and the court will not concoct one. In fact, there are reasons to believe that the federal government would agree to amend the PWD waiver. Defendant does not dispute that the federal government encourages states to use waivers to attempt to achieve community integration. (Pl.'s 56.1 ¶ 9.) Nor has Defendant established that such an amendment would impose significant costs on the State or the federal government. Accordingly, the requirement that HFS amend its waiver does not constitute a fundamental alteration in the PWD program.

Nor would the particular additional care that Grooms seeks work a fundamental alteration. As the State's PWD waiver application makes clear, HFS did not intend to provide private-duty nursing, though it would provide skilled nursing services. (PWD Waiver Renewal at 3028.) Private-duty nursing is defined as continuous–rather than part-time or intermittent–licensed nursing care in an individual's home. (*Id.* at 3053-54.) But the Seventh Circuit has held that increasing the hours of nursing care provided is not a fundamental alteration in the waiver. "Although private-duty nursing services have been removed from Illinois's basic Medicaid plan, a disabled individual can

---

(...continued)
in increased costs being imposed on the State of Illinois.

still access such services through the HSP waiver program. However, the SCM or exceptional care rate approved for the individual HSP participant operates to limit the amount of nursing care that he or she may receive." *Radaszewski*, 383 F.3d at 606 n.4. That HFS already provides some nursing care through the PWD waiver belies the suggestion that providing additional nursing for Grooms would create an entirely new Medicaid service or otherwise alter the substance of the Illinois Medicaid program. *Radaszewski*, 383 F.3d at 612.

Next, Defendant contends that a decision for Grooms would fundamentally offer the PWD waiver by abolishing two fundamental Medicaid requirements. First, HFS suggests that for Grooms to prevail would eliminate the "cost-neutrality" requirement, which limits the services to which an individual participating in a waiver program is entitled. That requirement permits a State to provide home or community-based care for an individual only if such care is not more expensive than the institutional care he or she needs, 42 U.S.C. § 1396n(c)(2)(D): thus the State is permitted to adopt, as a benchmark, the cost of care for an individual in an institution. HFS need not and indeed may not provide Medicaid assistance that runs afoul of the federally-mandated cost-neutrality considerations. Instead, if Grooms prevails, the State will determine cost-neutrality for a disabled individual requiring hospital-level care using the cost of hospital-level care as its point of comparison.

The parties also debate how the "medical necessity" requirement for home or community-based care would function, were Grooms to prevail (and indeed, both sides offer expert testimony on the question). The medical necessity requirement calls for a showing, for each separate component of the Medicaid program, that the individual served would not only benefit from but has an actual need for the service in question. *Bertrand v. Maram*, 495 F.3d 452, 458 (7th Cir. 2007) (citing 42 C.F.R. § 440.230(d)). According to Defendant's expert, Todd D. Menenberg, a Managing Director of Navigant Consulting, Inc. who consults on health care-related financial and economic matters, a decision in favor of Grooms would effectively change the medical necessity requirement,

because it would permit any individual's physician to evaluate the need for medical and non-medical services, thus bypassing the effort of creating an HSP Plan. (*Grooms v. Maram* Rebuttal to Samuel S. Flint Report by Todd D. Menenberg dated 5/25/07 ("Menenberg Rebuttal") at 3-4, DX2.) In Defendant's view, "reading a requirement into the Home Services Program that David Grooms can receive whatever services his physician feels are medically necessary to maintain him in the community is not a reasonable modification." (Mem. at 12.)

Defendant's concern appears to rest on a misinterpretation of the issues before the court. The unrebutted medical evidence shows that Grooms requires hospital-level care; no medical assessment finds that Grooms can be cared for adequately with nursing facility-level care. Thus, a decision in favor of Grooms in this case would not alter the requirement that an individual seeking home-based care demonstrate to the State (and not merely a testifying physician) that he or she has an actual medical need for the service sought, nor would such a decision alter the process by which "medical necessity" is determined. Nor would a decision in favor of Grooms obviate the requirement that, even if an individual demonstrates medical need for a particular service, that service will only be provided under the PWD waiver if the individual's care is adjudged to be "cost-neutral." In other words, as explained above, the SCM will remain as a cap on the funding available once medical need is established. Or, under certain circumstances (such as where an individual is, like Grooms, ventilator-dependent), the state-calculated exceptional care rate is used. In no case will a private doctor's definition of medical necessity undermine the program's structure and rules. Thus, for Grooms to prevail in this action would not change either statutory requirement for receipt of services under the PWD program.

Finally, Defendant points out that the Ninth Circuit has held that where a state has established a "comprehensive deinstitutionalization scheme," that is "effectively working," courts ought not tinker with the state's scheme. *Sanchez v. Johnson*, 416 F.3d 1051, 1067-8 (9th Cir. 2005) (citation omitted). *Sanchez* is readily distinguishable. In that case, the plaintiffs sought an

injunction requiring California state officials to increase the wages and benefits paid to providers of community-based care for the developmentally disabled, to match the wages and benefits paid to employees in state institutions. *Id.* at 1055. Ultimately, the court found that these changes would fundamentally alter the state's Medicaid program. The *Sanchez* plaintiff sought broad changes to the administration of the Medicaid program, with significant and obvious financial implications. This action, on the other hand, seeks only to modify the eligibility requirements applied to a small cross-section of disabled adults. The court concludes that ruling for Grooms in this case would not fundamentally alter the State's Medicaid program or PWD waiver.

### ii. Cost

Defendant also urges that the costs HFS would incur were it to accommodate Grooms with additional Medicaid assistance preclude a decision in his favor. The Supreme Court has ordered courts to consider whether home or community-based care for a disabled individual "can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Olmstead*, 527 U.S. at 607. When determining whether a state is obligated to provide the level of Medicaid assistance for home care requested by a disabled individual, the Seventh Circuit has also cautioned courts "to consider the cost of a plaintiff's care not in isolation, but in the context of the care it must provide to all individuals with disabilities comparable to those of the plaintiff." *Radaszewski*, 383 F.3d at 614. In other words, the court must not merely compare the cost of providing home care for Grooms, but must also consider, for example, whether the State will incur greater costs if compelled to fund Grooms's home care while simultaneously providing institutional care for others who cannot or choose not to receive home or community-based care. *Id.*

Defendant focuses on the change it expects that a ruling in favor of Groom action will effect on the statewide PWD waiver. In support of the argument that this change is cost-prohibitive, Defendant's expert, Todd Menenberg, has provided an expert report addressing relevant cost and

financial issues in this matter. (Menenberg Rept.) Menenberg estimated that the cost to the State of the modification proposed by Grooms's lawsuit would range from at least $238 million to $343 million annually. (*Id.* at 14.) Menenberg reaches this conclusion by considering two additional costs he concludes the State would be forced to bear, were it to implement the change Grooms requests and make it available for all Medicaid recipients in his condition. First, Menenberg estimated the cost to move all disabled current nursing facilities residents from their nursing facilities into home or community-based care, absent SCM limitations. (*Id.* at 9.) Menenberg's analysis relied on HFS data known as the Minimum Data Set ("MDS"). (*Id.* at 9 n.8.) The MDS consists of assessments completed by nursing facility residents periodically over the course of a year. (*Id.*) It appears that the MDS assessment is essentially a written questionnaire sent to nursing facility residents, although the means by which the survey was conducted is not entirely clear. Menenberg considered the most recently completed assessments in the MDS, as of September 30, 2006. (*Id.*)

In the MDS, Menenberg identified approximately 9,000 Medicaid-eligible individuals under age 60 (the age at which individuals not already grandfathered in to the Medicaid program age out of eligibility). (Menenberg Rept. at 9.) Of that number, approximately 216 answered three questions in the assessment affirmatively: (1) they were not scheduled to be discharged within ninety days; (2) they expressed a desire to leave the nursing facility; and (3) they had a support person positive toward the option of such a discharge. (*Id.*) Absent an SCM cap, Menenberg believed that these 216 individuals might opt for home or community-based care as opposed to institutionalization in a nursing facility, and would be eligible for the PWD waiver. (*Id.*) But a very large number of MDS survey respondents did not answer one or more of the critical questions in the MDS assessment. Extrapolating the data from individuals who did respond to all three critical survey questions to those who did not, Menenberg estimated that there are a total of 1,100 current nursing facility residents who meet all three criteria. (*Id.* at 10.) Thus, Menenberg believes that

approximately 1,100 individuals might leave their nursing facilities to seek home or community-based care, were Grooms to prevail.

Turning to the cost of transitioning these individuals to home or community-based care, Menenberg "judgmentally selected" twenty-eight individuals based on his assessment that those individuals were representative of the group of 216. (Menenberg Rept. at 10-11.) According to Menenberg, the activities of daily living ("ADL") scores–which assess the level of assistance an individual needs to complete activities such as eating, bathing, grooming, dressing, transferring, and incontinence–for these 28 individuals were representative of the ADL scores for the group of 216. (*Id.*) HFS uses those scores to make the determination-of-need calculation and, ultimately, to set the individual's SCM if he or she participates in the PWD waiver. Notably, there is no indication, apart from their need for assistance, that these twenty-eight individuals were found otherwise representative of the group of 216.

Having selected a group of twenty-eight with what he deemed representative ADL scores, Menenberg assessed the costs of transitioning those twenty-eight individuals from the institution to home or community-based care. To do so, Roberta Sue Coonrod, an RN and HFS employee, developed a sample service plan for each of the twenty-eight. (Menenberg Rept. at 11 & 11 n.13.) Menenberg then identified the average difference between the nursing facility rate as of fall 2006 and the estimated cost of home or community-based care to be $79.94 per day; due to rate changes effective January 2007, this difference was $83.01 per day in January 2007. (*Id.* at 12.) Menenberg therefore concludes that, for the 216 identified individuals, the additional cost in the fall of 2006, to provide home or community-based care would be approximately $6.3 million annually; the January 2007 rates translate into a cost of approximately $6.5 million annually. From these figures, Menenberg extrapolates to the 1,100 potentially eligible individuals and concludes the cost of allowing them home or community-based care (absent an SCM cap at the nursing facility level)

would be approximately $32 million using the fall 2006 rates or approximately $33 million using the January 2007 rates.

In addition, Menenberg considered the cost of providing additional services to those who are already participating in the PWD waiver program. According to Menenberg, if service plans were no longer used to restrict Medicaid assistance afforded to the PWD waiver recipients, the State would incur an additional cost of approximately $206 million annually. (Menenberg Rept. at 13.) If each SCM were increased by 196%–or the difference between the cost of services Grooms received under the service plan developed for him and the cost of the services he requested–the State would incur an additional total cost of approximately $302 million annually. (*Id.* at 14.) Again, Menenberg's analysis appears to assume that all persons now participating in the PWD waiver program in fact require far more costly institutional care.

In response to these calculations, Plaintiff has submitted the expert report of Dr. Samuel S. Flint, an Assistant Professor of Public Affairs at Indiana University Northwest. (Expert Report of Samuel S. Flint, Ph.D. dated 5/7/07 ("Flint Rept."), PX 27.) Flint criticized several facets of Menenberg's analysis. First, Flint argues that the extrapolation from the 216 surveyed nursing-facility residents to the group of 1,100 was improper because the group of 216 was not a representative sample. (*Id.* at 2-4.) According to Flint, Menenberg himself noted that 7,286–of approximately 9,000–individuals did not respond to the first survey question, which asked whether they would like to leave the facility in which they currently lived. (*Id.* at 4.) There is no evidence that explains why so many individuals declined to answer this question, or what percentage of respondents answered other questions. (*Id.* at 5.) Flint therefore rejects Menenberg's assumption that the desires of the 80% of surveyed individuals who did not respond to this question were identical to those of the 20% who did respond fully. (*Id.*) As Flint sees the data, the fact that just 216 of the 9,271 individuals responded affirmatively to all three questions Menenberg identified as

critical suggests that 216 is the absolute ceiling for the first group of individuals who Menenberg surveyed.  (*Id.*)

Flint also believes that Menenberg's calculations are otherwise inflated.  As discussed above, Menenberg's numbers purport to exclude any skilled nursing facility residents who will be discharged within ninety days of responding to the survey.  Flint points out that 193 responding individuals expressed uncertainty about their date of discharge, and that none of those 193 were excluded from Menenberg's analysis.  (Flint Rept. at 5.)  Since approximately 68% of individuals living in a skilled nursing facility are discharged within ninety days, it follows that some of the individuals who are uncertain about their date of discharge may well be discharged within ninety days.  (*Id.*)  Excluding these 193 from the group of 216, no more than twenty-three (one-quarter of one percent) current nursing-facility residents definitively meet all three Menenberg criteria.  (*Id.*)

Second, Flint critiqued Menenberg's methodology for identifying the cost of transitioning the individuals who do meet the Menenberg criteria from nursing-facility care to home or community-based care.  (Flint Rept. at 6.)  Flint opines that Menenberg's decision not to use a random sample but, rather, to make a conscious selection of twenty-eight individuals and then assess the costs associated with their particular situations, likely resulted in skewed cost projections.  (*Id.*)  For example, Flint points out that three of the twenty-eight selected individuals were eligible for an exceptional care rate, which is afforded only to the sickest 1% (only 540 of 47,624) of skilled nursing facility patients.  (*Id.*)  Individuals receiving an exceptional care rate were therefore significantly over-represented in Menenberg's judgmentally selected population.  Flint calculated that there is a .0003 chance that a random sampling process would so significantly over-represent the population of exceptional care rate patients.  (*Id.*)  According to Flint, by including so many of the sickest skilled nursing facility patients in his judgmentally-selected sample, Menenberg inflated the costs of transitioning current skilled nursing facility residents to home or community-based care.  (*Id.* at 7.)  In addition, Flint contends that Menenberg's sample size was insufficient to make

estimates for a population of approximately 9,000. (*Id.* at 7.) Finally, Flint points out that Menenberg relied on one nurse to develop projected service plans, and that her employment by HFS suggests the possibility of bias. (*Id.* at 7-8.)

With regard to the group of current PWD participants whose benefits would, according to Defendant, increase, were Grooms to prevail, Flint identifies what he believes are several flaws with the Menenberg analysis. First, Flint observes, there is no basis for Menenberg's assumption that current Medicaid policies–including utilization review and medical necessity guidelines–will be abandoned in favor of giving Medicaid-eligible individuals whatever benefits they seek. (Flint Rept. at 9.) Flint also disagrees with Menenberg's opinion that all PWD beneficiaries would be eligible for additional benefits: only 3.3% of the current PWD beneficiary population–or 864 individuals–are currently receiving assistance that reaches the SCM cap. (*Id.* at 11.) Thus, the other 96.7% of PWD waiver recipients presumably do not require and would not be eligible for additional Medicaid benefits, were the SCM cap raised or removed. Thus, any alteration to the SCM would only impact a small minority of PWD waiver recipients. Flint also points out that Grooms's current care plan entitles him to exceptional care. Grooms's exceptional care rate exceeds the highest current SCM cap, and thus it is unclear to Flint why current PWD beneficiaries (most of whom, as explained above, are not entitled to the exceptional care rate) would benefit in any way from a decision altering Grooms's Medicaid benefits. (*Id.*)[6]

Correcting for these claimed flaws in Menenberg's analysis, Flint provides his own cost estimates. With respect to impact on the group of current nursing-facility residents, Flint estimates that the cost to the State, were Groom to prevail (and the same relief accorded to all similarly situated individuals) ranges from less than zero to, at most, $6 million. (Flint Rept. at 8.) With

---

[6] The Seventh Circuit highlighted but deferred ruling on this issue in *Radaszewski*, 383 F.3d 599. There, the court deemed it "not immediately apparent" whether the relevant group of disabled persons for purposes of a fundamental-alteration defense should be defined. *Id.* at 614 n.5.

regard to current PWD participants, Flint estimates that the cost of generalizing the more generous PWD waiver Grooms seeks would range from zero dollars to, in the event of a 30% increase in benefits afforded to all 864 eligible PWD beneficiaries, $456,372. (Flint Rept. at 11.) Suggesting that these numbers are likely over-estimates, Flint points out that Illinois is "over-bedded" in nursing facilities: it has only 4.3% of the United States population, but 5.1% of the nation's skilled nursing facilities and 6% of the nation's skilled nursing facility beds. (Flint Rept. at 12.)[7] Likewise, Illinois spends 7.5% of its annual Medicare expenditures for beneficiaries on skilled nursing facilities, compared to an average of 5.4% for other states. (*Id.* at 13.) He also points out that individuals whose medical needs would not qualify them for institutionalization in other states are deemed appropriate for entry into skilled nursing facilities in Illinois. (*Id.*) Thus, Flint identifies a bias toward institutionalization in Illinois, and a resistance, in Illinois's Medicaid program, to provision of home or community-based care. (*Id.*)

Considering substantially similar analyses from Menenberg and Flint, one district court has found Menenberg's opinions devoid of reliable principles and methodology and deemed them not credible or persuasive. *Radaszewski*, 2008 WL 2097382, at *10-12. Addressing the population of currently institutionalized individuals who might seek home or community-based care, that court noted that Menenberg had not identified any individuals in a situation similar to that of Eric Radaszewski, in that his needs could not be met with a nursing facility level of care. *Id.* at *11. The same is true here: Menenberg has focused on all Illinois nursing facility residents, rather than isolating the discrete group of individuals who require hospital-level care. The *Radaszewski* court found significant Menenberg's failure to use random sampling and his reliance on the assessments of a single, HFS-employed nurse. *Id.* at *12. With regard to the population of current PWD

---

[7]       This circumstance suggests the possibility that in order to balance the state Medicaid budget, a certain percentage of the institutional beds be full.   If the circumstance is the basis for the state's resistance to providing home or community-based care for individuals with extraordinary needs, it has failed to make this explicit.

beneficiaries, Judge Darrah rejected, as unsubstantiated, Menenberg's premise that all HSP participants would seek and receive additional services up to and beyond the SCM cap. *Id.* at *11. There, as in this case, Menenberg had failed to identify any individual in a similar situation to the plaintiff, with similar needs and requirements. *Id.* Based in part on his analysis of the expert opinions, on May 9, 2008, Judge Darrah entered a permanent injunction enjoining HFS from reducing Eric's coverage to anything less than sixteen hours per day of skilled nursing services provided by a registered nurse at Eric's parents' home seven days per week as well as an additional 336 hours per year of respite care. Opinion and Order, *Radaszewski v. Maram*, No. 01 C 9551 (N.D. Ill. May 9, 2008). At this stage, the court concludes that Menenberg's calculations are not sufficient to entitle Defendant to summary judgment in this case.

## CONCLUSION

For the reasons set forth above, Defendant Barry S. Maram's Motion for Summary Judgment (149) is denied. Plaintiff David Grooms has not sought summary judgment in his favor. As explained above, the court expects, to grant Plaintiff David Grooms preliminary relief. Accordingly a status hearing is set for Monday, June 9, 2008, at 9:00 a.m., at which the court will determine the preliminary and/or permanent relief to which Grooms is entitled.

Finally, the court notes that, during the course of briefing the pending motions, the parties have not answered several questions significant to this litigation. The court therefore invites additional submissions to illuminate certain issues that remain unclear, many of which were identified by the Seventh Circuit as critical to any final decision in this case:

1. Where would Grooms receive care if he is no longer able to continue receiving care at home (*e.g.* state-run institution or private facility)? *See Radaszewski*, 383 at 614.

2. If Grooms were placed in an institution, what services would he receive in this institution? *See Radaszewski*, 383 at 610. In particular, would Grooms be entitled to private-duty nursing care?

3. If Grooms were placed in an institution, would HFS be required to provide him with the level of care he needs in order to survive? *See Radaszewski*, 383 at 611.

4.    If Grooms were placed in an institution, what amount would the services Grooms would receive there cost the State? *See Radaszewski*, 383 at 613-14.

5.    If Grooms continues to receive home care, what amount would home care at a hospital-level of care cost the state? *See Radaszewski*, 383 at 613-14.

6.    If Grooms continues to receive home care, what other costs would the state bear, considering that enabling Grooms to receive home care would not necessarily permit the state to close or reduce the size of its existing institutions? *See Radaszewski*, 383 at 614.

7.    Given that the court must take into account the needs of "other persons with the same broad type of disabilities" to assess a fundamental alteration defense, what is the relevant group of disabled persons in this case, for purposes of making this calculation? *See Radaszewski*, 383 at 614 n.4.

8.    Given that the court must taken into account the broader context of the State's Medicaid program, what impact do the empty beds Flint has identified have on the cost-benefit analysis in this action?

ENTER:

Dated: May 30, 2008

_____
REBECCA R. PALLMEYER
United States District Judge